Filing # 224165127 E-Filed 05/29/2025 05:39:18 PM

**IN THE CIRCUIT COURT OF THE TENTH JUDICIAL CIRCUIT**
**IN AND FOR POLK COUNTY, FLORIDA**
**CIVIL DIVISION**

| | |
|---|---|
| **Nailyn Reyes,**<br><br>*Plaintiff,*<br><br>**v.**<br><br>**Bayview Solutions, LLC, GDC Solutions, LLC d/b/a Apex Mediation Services, Positive Payment Solutions, LLC, Aron Nathan Tomko, and John Does 1-10,**<br><br>*Defendants.* | Case No: __________________<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

COMES NOW the Plaintiff, **Nailyn Reyes** ("**Ms. Reyes**"), by and through her attorneys, Seraph Legal, P.A., and complains of the Defendants, **Bayview Solutions, LLC ("Bayview Solutions"), GDC Solutions, LLC,** doing business as Apex Mediation Services ("**Apex Mediation**"), **Positive Payment Solutions, LLC ("Positive Payment Solutions")** and **Aron Nathan Tomko** ("**Tomko**"), and, currently, **John Does 1-10**, (collectively, the "**Defendants**"), stating as follows:

**PRELIMINARY STATEMENT**

1. This is an action brought by Ms. Reyes against Bayview Solutions, Tomko, John Doe 1, and Apex Mediation for violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, et seq., and against the Defendants for violations of the Florida Consumer Collection Practices Act, Section 559.55, Florida Statutes, et seq. ("FCCPA").

**JURISDICTION AND VENUE**

2. Jurisdiction arises under the FDCPA, 15 U.S.C. § 1692k(d) and the FCCPA,



**2025CA-002080-A000-BA Received in Polk 05/29/2025 07:02 PM**

Section 559.77, Florida Statutes, and Section 34.01, Florida Statutes.

3. Defendants are subject to the provisions of the FDCPA and the FCCPA, and the Defendants are subject to the jurisdiction of this Court pursuant to Section 48.193, Florida Statutes.

4. Venue is proper in Polk County pursuant to Section 47.051, Florida Statutes, because the actions giving rise to this complaint occurred within Polk County.

## PARTIES

### Ms. Reyes

5. Ms. Reyes is a natural person residing in Polk County, Florida, and a *Consumer* as defined by the FDCPA, 15 U.S.C. § 1692a(3), and the FCCPA, Section 559.55(8), Florida Statutes.

### Bayview Solutions

6. **Bayview Solutions** is a Florida limited liability company with a primary address of 233 3rd St. N., Suite 201, St. Petersburg, FL 33701.

7. Bayview Solutions' registered agent is Registered Agent Solutions, Inc., 2894 Remington Green Ln., Suite A, Tallahassee, FL 32308.

### Apex Mediation

8. **Apex Mediation** is an Ohio limited liability company with a primary business address of 27801 Euclid Ave., Suite 5607, Euclid, OH 44132.

9. The Ohio registered agent for Apex Mediation is Gregg Champion, 27801 Euclid Ave., Suite 5607, Euclid, OH 44132.

10. On April 18, 2015, Apex Mediation filed articles of incorporation with the Ohio Secretary of State, attesting it was a "third party consumer debt collection agency."

11. Despite transacting business in Florida, Apex Mediation has not registered with the Florida Secretary of State nor the Florida Office of Financial Regulation, and does not hold any *Consumer Collection Agency* license within Florida.

12. The owner(s) and managers of Apex Mediation are currently unknown to Plaintiff. Once their identities are discovered, Plaintiff will amend her complaint to include their true name(s).

**Tomko**

13. **Tomko** is the owner and CEO of Bayview Solutions, and is believed to reside at 6043 Gulfport Boulevard S, Gulfport, Florida 33707.

14. A shareholder, owner, officer, member, manager, employee or agent of a corporate debt collector can be held liable for violating the FDCPA, without piercing the corporate veil, by being directly involved in the day-to-day operation of the company, including the training and managing of employees, reviewing or supervising the review of accounts, materially participating in the activities of the company, supervising collection activities, overseeing compliance with applicable collection laws, ratifying unlawful acts, and the like, for the reason that each such individual is himself a "debt collector" within the statutory definition, namely, each is a "person" in a business, "the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). See *See Fed. Trade Comm'n v. Primary Grp., Inc.*, No. 16-13532, at *3 n.2 (11th Cir. Sep. 29, 2017); see also *Kistner v. Law Offices of*

*Michael P. Margelefsky, LLC*, 518 F.3d 433, 435-438 (6th Cir. 2008); *Russell v. Goldman Roth Acquisitions, LLC*, 847 F.Supp.2d 994, 1004-06 (W.D.Mich. 2012).

15. Bayview Solutions, Tomko, Apex Mediation, and John Doe 1 are *Debt Collectors* within the meaning of the FDCPA, 15 U.S.C. § 1692a(6), and the FCCPA, Section 559.55(7), Florida Statutes, in that they use instrumentalities of commerce, including postal mail and the internet, interstate and within the State of Florida, for their businesses, the principal purposes of which are the collection of debts, and/or they regularly collect or attempt to collect, directly or indirectly, debts owed or due or asserted to be owed or due to others.

**Positive Payment Solutions**

16. **Positive Payment Solutions** is a Georgia limited liability company, with a primary business address of 3300 Centerville Highway, Snellville, GA 30039.

17. The Georgia registered agent for Positive Payment Solutions is Stephen M. Katz, 1225 Johnson Ferry Rd., Suite 125, Marietta, GA 30068.

**FACTUAL ALLEGATIONS**

**Ms. Reyes 'Debt' Subject To 150% Interest Rate**

18. Supposedly, sometime in or around 2016, Ms. Reyes incurred a debt of $518.60 (the "Debt") to WhyNotLeaseIt, a consumer finance company.

19. The Debt concerned Ms. Reyes's purchase of furniture for her household from a retailer called Town Furniture.

20. WhyNotLeaseIt, later became known as Tempoe, and was owned by Tempoe, LLC.

21. Tempoe, LLC, in turn, was owned by Axcess Financial, a large lender with many

different consumer loan products, almost all of which lend to consumers at triple-digit interest rates[1].

22. WhyNotLeaseIt charged consumers effective interest rates of 150% to 225% annually.

23. Ostensibly, a consumer would "lease" the consumer product through WhyNotLeaseIt, but the agreements were intended by Tempoe to function as loans and, in almost every case, including Ms. Reyes, the consumer intended for the "lease" to function as a loan.

24. WhyNotLeaseIt made loans primarily through hundreds of retail "partners;" WhyNotLeaseIt's marketing pitches to potential new retail partners emphasized that WhyNotLeaseIt views its products as loans.

25. In its contract with Ms. Reyes, WhyNotLeaseIt utilized the term "consumer lease agreement" rather than "loan" primarily to attempt to evade the usury laws of many states in which it did business, including Florida.

26. Ms. Reyes disputes owing the Debt, because (1) no unpaid amount remained owed to WhyNotLeaseIt, and (2) even assuming, *arguendo*, some amount was owed, the Debt was void *ab initio* due to the application of an effective interest rate exceeding 150% annually[2].

27. Nonetheless, the Debt allegedly arose from expenses for family, personal, or household purposes, specifically home furniture, and therefore meets the definitions of *Debt* under the FDCPA, 15 U.S.C. § 1692a(5), and the FCCPA, Section 559.55(6), Florida Statutes.

28. At some point, Tempoe LLC, or some other successor-in-interest, sold the Debt to Security Credit Services.

---

[1] For example, one of Axcess Financial's loan products is Xact Loans (https://www.xact.com/) makes loans to consumers at interest rates averaging 225% annually.

[2] Florida's general usury statute, § 687.071, Fla. Stat., renders the act of making a loan with an annual interest rates greater than 45% a third-degree felony and caps interest rates at 18%.

29. On September 11, 2023, Tempoe, LLC settled a lawsuit brought against it by the Consumer Financial Protection Bureau ("CFPB"), and agreed to pay a $2 Million civil penalty and to waive balances on outstanding "unpaid" accounts not assigned elsewhere, which numbered approximately 19,300 and had an aggregate total value of approximately $33 Million[3].

**Bayview Solutions and Apex Mediation Attempt to Collect Debt Unlawfully**

30. Shortly after Tempoe's settlement with the CFPB, Security Credit Services discontinued collecting on accounts it had purchased from Tempoe/WhyNotLeaseIt.

31. Bayview Solutions then purchased Ms. Reyes's purported Debt from Security Credit Services, or some other downstream successor-in-interest.

32. Thus, on information and belief, at the time Tomko, as CEO of Bayview Solutions, made the decision to purchase a portfolio of debts which contained Ms. Reyes's purported Debt, both he and Bayview Solutions were aware of the problematic nature of Tempoe/WhyNotLeaseIt, but chose to purchase them anyway for the express purpose of then collecting the balances from the relevant consumers.

33. At some point prior to October 9, 2024, Tomko, as CEO of Bayview Solutions, hired Apex Mediation and instructed it to collect $518.60 from Ms. Reyes.

34. On October 9, 2024, Apex Mediation called Ms. Reyes' cell phone and left a voicemail message stating there was a "time-sensitive legal matter" which was "tied" to her Social Security number and was being handled by Apex Mediation and that it was *urgent* she call back immediately to prevent any "further legal action" from occurring.

35. Apex Mediation also called Ms. Reyes' cell phone and left similar messages on November 19, 2024, and November 26, 2024.

36. Ms. Reyes called Apex Mediation back and spoke with a collection agent

[3] https://www.consumerfinance.gov/enforcement/actions/tempoe-llc/ (accessed May 20, 2025)



2025CA-002080-A000-BA Received in Polk 05/29/2025 07:02 PM

identifying herself as "Ayva."

37. Ayva stated the Debt was from an account opened in 2016, and that if Ms. Reyes did not begin making payments on the Debt, Ms. Reyes would end up owing more because of "legal fees," and that Ms. Reyes' wages would be garnished and her tax return seized.

38. When Ms. Reyes asked Ayva to explain how her wages could be garnished or tax return seized, Ayva reiterated that Apex Mediation would take legal action against her if she did not pay.

39. Ms. Reyes, a single mother raising a disabled child with no other income or outside assistance, almost immediately became overwhelmed.

40. Ms. Reyes communicated this to Ayva, and that she could not afford to make payments, and that any payments she made could interfere with her ability to care for her disabled child.

41. Ayva reiterated that if Ms. Reyes did not pay, she would be sued, and her wages would be garnished.

42. Apex Mediation is not a law firm, does not employ any attorneys, and does not sue consumers.

43. Apex Mediation had no intention of suing Ms. Reyes for the Debt.

44. Apex Mediation had no legal ability to sue Ms. Reyes for the Debt.

**Debt, Even If Somehow Legitimate, Was Void *Ab Initio***

45. As aforementioned, the underlying debt stemmed from a usurious loan with an interest rate exceeding 150%.

46. Long-standing public policy in Florida confirms the alleged Debt is not owed. See, e.g., *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935) (criminally

usurious loans are "void as against the public policy of the state as established by its Legislature.")

47. Any person who willfully makes a criminally usurious loan, in addition to subjecting themselves to criminal sanctions, forfeits the right to collect payment for the loan. *Id.*

48. Indeed, even the recovery of the principal balance made at usurious rates is impermissible under Florida law. *Rollins v. Odom*, 519 So. 2d 652, 656 (Fla. Dist. Ct. App. 1988).

49. The purpose of the usury statutes is to protect the needy borrower by penalizing the unconscionable money lender. *Stubblefield v. Dunlap*, 148 Fla. 401, 4 So.2d 519 (1941); *see also Pushee v. Johnson*, 123 Fla. 305, 166 So. 847 (1936); *River Hills, Inc. v. Edwards*, 190 So.2d 415 (Fla. 2d DCA 1966).

**<u>Debt Was Time-Barred</u>**

50. Apex Mediation and Bayview Solutions claim the last payment made to WhyNotLeaseIt was in January 2017.

51. Apex Mediation and Bayview claim the Debt owed to WhyNotLeaseIt was based on a written contract.

52. The statute of limitations for bringing suit for indebtedness based on a written contract is five years; see § 95.11(2)(b), Fla. Stat.

53. As such, even assuming the Debt had been made at a lawful interest rate, the Debt was not legally-enforceable against Ms. Reyes as it was time-barred.

54. Suing for a time-barred debt inherently violates the FDCPA.

**<u>False Threats Compel Plaintiff To Make Payment</u>**

55. Because of Apex Mediation's frequent, false, and misleading threats and

statements, Ms. Reyes -- petrified she would be sued for non-payment -- agreed to pay the Debt in a series of five payments.

56. Adding insult to injury, each payment would incur a $15 additional "fee," although Apex Mediation never specifically stated what the $15 fee was for.

57. Ms. Reyes made her first payment of $144.02 plus a $15 fee for a total of $159.02 on January 31, 2025.

58. In sum, Apex Mediation called Ms. Reyes multiple times, threatening legal action, about a debt it knew was wildly usurious and from a company sued out of existence by an agency of the United States government; after learning she was a single mother caring for a disabled child without help, it then used this information against her to frighten her into making payments she could not afford.

59. Ms. Reyes made several other payments to Apex Mediation as well.

60. In several instances, the payments overdrew Ms. Reyes's checking account.

61. Ms. Reyes then called Ayva, who would make comments like she would have to "check with the lawyers (at Apex Mediation)" to see if she could get the payment date extended, even though there were no lawyers at Apex Mediation to check with.

62. The true purpose of Ayva's comments, of course, were to reiterate, albeit falsely and deceptively, to Ms. Reyes that she would be sued if she did not continue with her payment plan.

63. On May 21, 2025, Apex Mediation called Ms. Reyes on her cell phone.

64. Apex Mediation stated it had noticed payments had stopped, and that because the WhyNotLeaseIt account was "charged off," this – somehow – meant she was legally-required to keep making payments on it.

65. Apex Mediation once again engaged in making false and misleading statements in connection with the collection of a consumer debt, since designating an account as "charged off" has no particular bearing on if the account is legally-enforceable.

**Bayview Solutions and Tomko's History of Similar Actions**

66. Tomko has been operating Bayview Solutions since 2015, acting as its CEO and sole owner.

67. Over this time, Tomko has hired a virtual Who's Who of the debt collection underworld to collect on dubious consumer debts he has purchased at a fraction of face value, usually from some other debt collector, and not from the creditor, directly.

68. For example, in 2020 Tomko hired United Payment Center Inc. ("United"), a debt collector with a subsidiary company literally named Boiler Room Enterprises, Inc., an "F" rating with the Better Business Bureau, and a history of using fake names which mimicked those of law firms to collect debt (e.g. "Knight Legal"), to collect a 15-year-old debt supposedly owed to Chase Bank that Bayview Solutions had bought. United then called the consumer, falsely stating it was from the "Process Service Dispatch Department" and to call the "law firm" handling the case back immediately to avoid litigation. *Charisse Mitchell vs. United Payment Center Inc., Bayview Solutions LLC and Aaron Nathan Tomko, et. al*, case 1:20-cv-01125-HYJ-RSK, W.D. Mich., November 19, 2020.

69. In 2023, Tomko hired a debt collection agency using the fake names "ASAP Processing" and "Hartwood & Associates" to collect on a balance supposedly originally owed to My Pet Funding, a predatory lender which makes loans at interest rates often exceeding 200% for the purpose of *buying puppies*. Of note, the balance had also been previously assigned to Security Credit Services prior to Tomko buying it for Bayview Solutions.

70. "ASAP Processing" and "Hartwood & Associates" then called the consumer, falsely claiming a "court-ordered subpoena will be served" to the consumer that day, unless payment was made. *Jonathan Hobbs vs. Bayview Solutions LLC et. al*, case 2:24-cv-02443-JWL-GEB, U.S.D.C., Kansas, September 25, 2024.

71. As the above illustrates, within the debt buying universe, a certain type of debt collection agency exists, typified by exhibiting little regard for the rights of consumers as well as little concern about the legitimacy of the debts they are collecting. These sorts of debt collectors typically purchase portfolios of charged-off, delinquent consumer debt from debt brokers or other debt collectors, often paying pennies on the dollar, or less, for the accounts.

72. Like any bargain-basement product, there are defects abound. These portfolios – usually sold with no legitimate documentation showing chain-of-custody, and, often, sold with no supporting account documentation whatsoever – are typically riddled with inaccuracies, paid accounts, disputed accounts, and/or duplicate accounts. Indeed, Ms. Reyes disputes owing any debt originally due to WhyNotLeaseIt.

73. No central registry or database containing information about which person or entity owns a particular debt exists in the United States.

74. Since the debt portfolios are a little more than Excel spreadsheets containing basic information about the purported debts, such as the consumer's name, address, account number, and supposed balance, even less savory debt collectors will sometimes literally steal debt portfolios from other debt collectors by obtaining employment at a rogue debt collection agency, copying the Excel spreadsheet to a USB thumb drive when no one is looking, and then attempting to collect the debts themselves under their own company name. *See, e.g.*, Jake Halpern, *Paper Boys: Inside the Dark, Labyrinthine, and Extremely Lucrative World of*

*Consumer Debt Collection*, New York Times, August 19, 2014; Jake Halpern, *Bad Paper: Chasing Debt from Wall Street to the Underworld* (2014).

75. Likewise, unscrupulous debt brokers will often sell the same debt portfolio to multiple debt collectors, with the debt collectors unaware that they are not the only "owner" of the debt.

**Positive Payment Solutions Helps Facilitate Unlawful Debt Collection**

76. When Ms. Reyes made payments to Apex Mediation, she was charged a $15 "fee" which, on information and belief, was used to pay Positive Payment Solution for processing the payment through the Visa® payment network.

77. Access to the Mastercard® and Visa® payment network is of critical importance to debt collectors like Apex Mediation, since most consumers make payments to them only after being threatened with legal action and do so in the heat-of-the-moment.

78. Without a way to instantly process payments electronically, Apex Mediation would have to rely on a consumer mailing a check or money order to it – something which would significantly decrease the number of consumers who ultimately end up paying.

79. However, virtually every financial institution which sells payment processing services does extensive "know your customer" vetting of potential customers.

80. As a result, debt collection entities like Apex Mediation often find it difficult, if not impossible, to obtain the merchant account ("MA") required to process Visa and Mastercard transactions.

81. This is especially true if the owner has had prior MA's with a large number of disputed transactions, or a large number of transactions which did not result in a payment authorization, or if the owner of the business has a low credit score or unpaid debts on his/her

personal credit report.

82. Further, the Visa® payment network prohibits ***any user*** of the network for running charges related to an existing debt, which includes "the obligation to repay money in connection with loans, credit card balances, money advanced on goods or services previously purchased, (and) repayments that include interest (expressly or implicitly)." See *Visa Core Rules and Visa Product and Services Rules*, last updated October 15, 2022.

83. The crux of the restrictions imposed by Visa® is blunt and common-sense: it is unwise to allow a consumer to make a credit card payment by charging the payment to another credit card.

84. The Visa® payment network requires each merchant using its payment network to declare what Merchant Category Code ("MCC") it falls under.

85. Identifying with an MCC indicating a business is involved in debt collection almost always results in the prospective merchant being declined a MA.

86. Visa® prohibits certain MCC's from utilizing its payment network at all; for example, even payments on ***government***-backed loans (MCC 9411), which includes student loans, are prohibited by the Visa® payment network.

87. Thus, Apex Mediation contracted or otherwise participated with Positive Payment Solutions to process debit card transactions on its behalf.

88. Such "third-party billing" is prohibited by Visa®, unless the entity processing the payment is credentialed to act as a third party billing service, which Positive Payment Solutions is not.

89. Typically, the cost to process a $150 debit card transaction is about 26 cents.

90. Apex Mediation charged Ms. Reyes a fee of $15, or roughly a 5,669% markup

over actual cost.

91. On information and belief, Positive Payment Solutions retained some, or all, of the $15 as its fee for processing illicit transactions in violation of Visa® payment network rules.

92. Positive Payment Solutions was aware the debit card transactions it ran for Apex Mediation and, ultimately, Bayview Solutions, were consumer payments on old, out-of-statute, charged-off consumer debts.

93. Positive Payment's name and location in Georgia appeared on Ms. Reyes' bank statements, like this payment made by Ms. Reyes on April 9, 2025:

Apr 9, 2025 -$130.00
Positive Payment 04/08 $284.67
PURCHASE XXXXX40402 GA

94. Tamko, in his capacity as owner and manager of Bayview Solutions, was responsible for implementing Bayview Solutions' aforementioned collection policies, including the placement of debts with collection agencies with a documented history of using illegal, misleading, and deceptive collection techniques.

95. John Doe 1, in his/her capacity as owner and manager of Apex Mediation, was responsible for implementing Apex Mediation's aforementioned collection policies, including the threatening of litigation without the intention or ability to sue consumers.

96. Bayview Solutions, a debt collector, is liable for the actions of its agent, Apex Mediation, for actions occurring within the scope of its agency.

97. Bayview Solutions was well aware of the tactics employed by Apex Mediation and condoned them.

98. Tamko and John Doe 1 are thus jointly and severally liable for the actions of Bayview Solutions and Apex Mediation, respectively, and the actions taken pursuant to the policies they put in place and had authority to control. *See Fed. Trade Comm'n v. Primary Grp., Inc.*, No. 16-13532, at *3 n.2 (11th Cir. Sep. 29, 2017); see also *Pennsylvania v. Think Fin., Inc.*, CIVIL ACTION No. 14-cv-7139, at *57 (E.D. Pa. Jan. 14, 2016); *Brink v. First Credit Resources*,57 F.Supp.2d 848, 862 (D.Ariz.1999); *Alonso v. Blackstone Financial Group, LLC*, 962 F. Supp. 2d 1188, 1205 (E.D. Cal. 2013); *Jenkins v. Puckett and Redford P.L.L.C.*, 2020 WL 4517933, at *9 (W.D. Wash. Aug. 3, 2020) (individual employees of debt collector can be held personally liable under FDCPA without piercing corporate veil); *Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 405 (3d Cir. 2000) (finding a general partner who exercised control over a limited partnership to be liable for the acts of the partnership under the FDCPA).

99. At no point did Apex Mediation ever mail Ms. Reyes any notice of rights pursuant to 15 U.S.C. § 1692(g).

100. At no point has Apex Mediation ever obtained a *Consumer Collection Agency* license from the Florida Office of Financial Regulation, despite routinely collecting consumer debts from Florida residents concerning debts originating in Florida from businesses with physical locations in Florida.

101. In addition to suffering direct economic damages from the money unlawfully taken from her by Defendants, Ms. Reyes has suffered extreme emotional distress from being repeatedly threatened with legal action, wage garnishment, tax return seizure, and so on, even after confiding to Apex Mediation she is a single mother of a disabled child. Indeed, Apex Mediation took Ms. Reyes' statements about this and used it against her. Ms. Reyes' distress has

manifested itself in a loss of sleep, extreme irritability, despair, feeling of hopelessness, and worse.

102. Ms. Reyes has hired the aforementioned law firm to represent her in this matter and has assigned her right to fees and costs to such firm.

**COUNT I**
**VIOLATIONS OF THE FDCPA –**
***Apex Mediation, Bayview Solutions, Tomok, John Doe 1***

103. Ms. Reyes adopts and incorporates paragraphs 1 – 102 as if fully stated herein.

104. Apex Mediation, Bayview Solutions, Tomko and John Doe 1 violated **15 U.S.C. § 1692e** and **1692e(10)** when Apex Mediation used false, deceptive, and misleading representations in connection with the collection of a debt by claiming a usurious and void debt, from a company sued out of existence by an agency of the United States government, and which was time-barred, would result in legal action, wage garnishment, tax return seizure, if not paid immediately. Apex Mediation made other similar wildly-false claims as well.

105. Apex Mediation, Bayview Solutions, Tomko and John Doe 1 violated **15 U.S.C. § 1692e(2)(a)** by using false representations about the character, amount, or legal status of a debt by claiming a usurious and void debt, from an original creditor sued out of existence by an agency of the United States government, and which was time-barred, would result in legal action, wage garnishment, tax return seizure, if not paid immediately. Apex Mediation made other similar wildly-false claims as well.

106. Apex Mediation, Bayview Solutions, Tomko and John Doe 1 violated **15 U.S.C. § 1692e(3)** by making false representations that Apex Mediation were attorneys, when they are not.

107. Apex Mediation, Bayview Solutions, Tomko and John Doe 1 violated **15 U.S.C. § 1692e(4)** by making false representations that Ms. Reyes' wages and tax return would be garnished or seized, when this legally could not happen and Apex Mediation did not intend to take such action.

108. Apex Mediation, Bayview Solutions, Tomko and John Doe 1 violated **15 U.S.C. § 1692e(5)** by making false representations that Ms. Reyes' wages and tax return would be garnished or seized, when this legally could not happen and Apex Mediation did not intend to take such action.

109. Apex Mediation, Bayview Solutions, Tomko and John Doe 1 violated **15 U.S.C. § 1692f** by using unfair and unconscionable methods to collect a debt, when Apex Mediation intentionally collected a usurious and void debt, from an original creditor sued out of existence by an agency of the United States government, and which was time-barred, by falsely claiming nonpayment would result in legal action, wage garnishment, tax return seizure. Apex Mediation made other similar wildly-false claims as well.

110. Apex Mediation, Bayview Solutions, Tomko and John Doe 1 violated **15 U.S.C. § 1692f(1)** by collecting amounts not authorized by law, to wit, the Debt as well as $15 per payment processing fees for each payment.

111. Apex Mediation, Bayview Solutions, Tomko and John Doe 1 violated **15 U.S.C. § 1692(g)(a)** when Apex Mediation failed to send any notice of rights as required by this subsection: (1) the amount of the debt; (2) the name of the creditor to whom the debt is owed; (3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector; (4) a statement that if the consumer notifies the debt collector in writing within the

30-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and (5) a statement that, upon the consumer's written request within the 30-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

**WHEREFORE,** Ms. Reyes respectfully requests that this Honorable Court enter judgment against Apex Mediation, Bayview Solutions, Tomko and John Doe 1, jointly and severally, for:

a. Statutory damages of **$1,000**, pursuant to 15 U.S.C. § 1692k(a)(2)(A);

b. Actual damages, including damages for loss of credit opportunities, damage to credit scores, and emotional distress pursuant to 15 U.S.C. § 1692k(a)(2)(A);

c. Reasonable costs and attorneys' fees pursuant to 15 U.S.C. § 1692k(a)(3); and,

d. Such other relief that this Court deems just and proper

**COUNT II**
**VIOLATIONS OF THE FCCPA –**
***Apex Mediation, Bayview Solutions, Positive Payment Solutions, Tomok, John Doe 1***

112. Ms. Reyes adopts and incorporates paragraphs 1 – 102 as if fully stated herein.

113. Apex Mediation, Bayview Solutions, Tomok, and John Doe 1 violated **Section 559.72(9), Florida Statutes**, when Apex Mediation asserted legal rights that did not exist, specifically, the right to bring a lawsuit against Ms. Reyes for a time-barred, usurious and void debt.

114. Positive Payment Solutions violated **Section 559.72(9), Florida Statutes**, when Positive Payment Solutions asserted legal rights that did not exist, specifically, the right to

process debit card payment through the Visa® payment network when it was doing so unlawfully as a third-party billing representative, and when it knew the underlying debt was not legitimate or enforceable.

115. Apex Mediation, Bayview Solutions, Tomok, and John Doe 1 violated **Section 559.72(9), Florida Statutes**, when Apex Mediation asserted a debt was legitimate when it knew it was not.

116. Positive Payment Solutions violated **Section 559.72(9), Florida Statutes**, when Positive Payment Solutions asserted that a debt was legitimate when it knew it was not, when it processed payments on behalf of Apex Mediation and Bayview Solutions. Amongst other red flags, it knew an unlawful $15 fee was tacked on to the purported balance of each payment.

117. Apex Mediation, Bayview Solutions, Tomok, and John Doe 1 violated **Section 559.72(12), Florida Statutes**, when Apex Mediation repeatedly communicated orally in such a manner as to give the false impression that Apex Mediation were attorneys, when they are not.

**WHEREFORE,** Ms. Reyes respectfully requests that this Honorable Court enter judgment against Apex Mediation, Bayview Solutions, Tomok, and John Doe 1, jointly and severally, for:

a. Statutory damages of **$1,000** pursuant to Section 559.77(2), Florida Statutes;

b. Actual damages, including emotional distress pursuant to Section 559.77(2), Florida Statutes;

c. Injunctive relief prohibiting Positive Payment Solutions, Apex Mediation, Bayview Solutions, Tomok, and John Doe 1 from trying to collect the bogus debt from Ms. Reyes;

d. Reasonable costs and attorneys' fees pursuant to Section 559.77(2), Florida Statutes; and

e. Such other relief that this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Ms. Reyes hereby demands a trial on all issues so triable.

Respectfully submitted on May 29, 2025 by:

**SERAPH LEGAL, P. A.**

*/s/ James Hubbard*
James Hubbard, Esq.
Florida Bar Number: 121405
JHubbard@seraphlegal.com
2124 W. Kennedy Blvd., Suite A
Tampa, FL 33606
Tel: 813-567-1230
Fax: 855-500-0705
*Counsel for Plaintiff*